ATTORNEYS FOR APPELLANT

Michael C. Keating
Keating, Bumb & Vowels, P.C.
Evansville, Indiana

Michael J. Danks
Danks & Danks
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Pamela Carter
Attorney General of Indiana

James D. Dimitri
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# INDIANA SUPREME COURT

MATTHEW ERIC WRINKLES,
    Appellant (Defendant below),

    v.

STATE OF INDIANA,
    Appellee (Plaintiff below).

)
)
)
)
)
)
)
)
)
)
)

Supreme Court No.
82S00-9408-DP-741

FILED
DEC 31 1997
CLERK OF THE
INDIANA SUPREME COURT
COURT OF APPEALS
AND TAX COURT

---

**APPEAL FROM THE VANDERBURGH CIRCUIT COURT**
The Honorable Richard L. Young, Judge
Cause No. 82C01-9407-CF-447

---

**ON DIRECT APPEAL**

---

SULLIVAN, Justice.

Defendant, Matthew Eric Wrinkles, appeals his convictions and death sentence for the murders of Debbie Wrinkles, Mark Anthony Fulkerson, and Natalie Fulkerson. We review and affirm the murder convictions and death sentence.

## Background

On June 30, 1994, Matthew Eric Wrinkles (defendant) filed for divorce from Debbie Wrinkles. Prior to the institution of divorce proceedings, Debbie and the couple's two children, Lindsey and Seth, had moved into the home of Mark Fulkerson, and his wife, Natalie; Mark was Debbie's brother.

At a provisional divorce hearing on July 20, 1994, defendant and Debbie agreed that Debbie would retain custody of Lindsey and Seth, and that defendant would have reasonable visitation rights. Defendant and Debbie agreed to meet later that day at a local fast-food restaurant so defendant could see his children. Because Debbie was tired, she and the children did not show up at the arranged meeting place and time. Later that night, defendant tried to reach Debbie at the Fulkersons' home, but was unsuccessful. Debbie likewise tried to arrange another meeting with defendant, but to no avail.

In the early morning of July 21, 1994, defendant climbed over a fence into the Fulkersons' back yard, cut the phone lines, unlawfully entered their home, and shot and killed Debbie, Mark, and Natalie.

Defendant was charged with three counts of Murder, the knowing killings of Debbie, Mark

and Natalie.[1] The State also sought the death penalty, alleging as an aggravating circumstance that defendant had committed another murder.[2] A jury found defendant guilty on all counts and recommended that the death penalty be imposed. The trial court, following the jury's recommendation, sentenced defendant to death.

We will cite additional facts as necessary.

Issues on Appeal

1. Evidentiary Claims

Defendant challenges the trial court's admission of evidence in two respects. We review the admission of evidence for an abuse of discretion by the trial court. Ross v. State, 676 N.E.2d 339, 345 (Ind. 1996); Kindred v. State, 524 N.E.2d 279, 298 (Ind. 1988). We find error reversible only if admitting the evidence affected a substantial right of the party. Ind.Trial Rule 61; Fleener v. State, 656 N.E.2d 1140, 1141-42 (Ind. 1995); Hardin v. State, 611 N.E.2d 123, 131-32 (Ind. 1993).

Hearsay. Defendant argues that the trial court erroneously admitted testimony from Lisa

---

[1]Ind. Code § 35-42-1-1(1) (1993). Unless otherwise indicated, references to Ind. Code § 35-42-1-1 refer to the version published in the 1993 Edition of the Indiana Code, the murder statute in effect at the time the crimes at issue were committed.

[2]Ind. Code § 35-50-2-9(b)(8) (Supp. 1994). Unless otherwise indicated, references to Ind. Code § 35-50-2-9 refer to the version published in the 1994 Supplement to the Indiana Code, the death penalty statute in effect at the time the crimes at issue were committed.

Shadrick regarding a telephone call Shadrick had received from Debbie Wrinkles a few days prior to

Debbie's murder. Shadrick testified, over defendant's objection, as follows (prosecutor questioning):

Q: An [sic] in that conversation, did Debbie Wrinkles tell you . . .
BY MR. DANKS [defense counsel]: Show my objection, Your Honor. That's hearsay.
BY MISS LLOYD [prosecutor]: Your Honor, if I could finish the question at least before the answer.
BY THE COURT: All right.

Q. . . . about her then existing state of mind?
BY MISS LLOYD: Which is an exception to the hearsay rule under the Indiana Rules of Evidence. In addition, it is where the declarant's unavailability is not in issue. If she answers yes that she mentioned how she was feeling basically at that time, that would be her state of mind present. State of mind and an exception to the hearsay rule.
BY THE COURT: You need some foundation as to how she knew who she was talking to.
BY MISS LLOYD: Okay.

Q: When you received the phone call, did you recognize the voice?
A. Yes.
Q. Whose voice was it?
A. Debbie Wrinkles.
Q. How many times had you talked to Debbie before that?
A. Lots.
Q. And you knew that was Debbie's voice?
A. Yes[.]
BY THE COURT: Any further objection?
BY MR. DANKS: Yes, Your Honor. It still goes to the truth of the matter asserted. And it's still hearsay. I don't believe the state of mind of Debbie Wrinkles is at issue.
BY THE COURT: Objection overruled. Go ahead.

Q. What did Debbie tell you about how she felt at that time?
A. She said that she was a nervous wreck, and that she was on medication. And every time she heard a noise she would jump 'cause she was scared. And that she had to sleep with a gun underneath her pillow now. And, uh, she was just scared.

> Q. Did she say of what?
> A. Of Eric [defendant].

(R. at 2517-19.)

Defendant contends that Shadrick's testimony is inadmissible hearsay not falling within the present state of mind exception, because Debbie Wrinkles' state of mind at the time of her murder was not an issue at trial. He further argues that Shadrick's testimony was not relevant to any issue introduced at trial and that, regardless of its relevance, the prejudicial impact of the testimony far outweighed any probative value.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. Ind.Evidence Rule 801(c). Hearsay is generally inadmissible. Evid.R. 802. However, a statement of a declarant's then existing state of mind is not excluded by the hearsay rule. Evid.R. 803(3). The State claims that Shadrick's testimony, to the extent it is hearsay, falls within this exception, and that defendant placed Debbie Wrinkles' state of mind at issue by claiming in his opening statement that she was the initial aggressor after he entered the Fulkersons' home. Defendant testified that after he entered the house, he saw Debbie in the hallway; she said to him, "Die, you bastard, die," and then shot at him. The State argues that Shadrick's testimony about Debbie's telephone call tends to show that Debbie feared for her life and that it was highly unlikely that she attacked defendant first. See Dunaway v. State, 440 N.E.2d 682, 686 (Ind. 1982) ("The [hearsay] statements indicate a fearful state of mind which would circumstantially explain her later action of attempting to hit defendant.").

- 6 -

Shadrick's testimony qualifies as hearsay to the extent it was offered to prove that Debbie was fearful of defendant, and we are unable to conclude that her state of mind was relevant to an issue in this case. Cf. Angleton v. State, 686 N.E.2d 803, 809 (Ind. 1997); Lock v. State, 567 N.E.2d 1155, 1159 (Ind. 1991). However, any error resulting from the trial court's admission of Lisa Shadrick's testimony is harmless, because her testimony was merely cumulative of other evidence demonstrating the stormy and often violent nature of the relationship between defendant and Debbie Wrinkles.[3] We find that the admission of Shadrick's testimony did not prejudice defendant's substantial rights.

Chain of Custody. Defendant's other argument regarding erroneously admitted evidence is that the State failed to establish an adequate chain of custody for the ballistic and serological evidence it introduced at trial. The State introduced several shell casings and bullets retrieved from the murder scene and victims and it introduced blood evidence linking defendant to the crime scene and establishing his movements through the house on the night of the murders.

"The State's burden in an attack on the validity of a chain of custody is to show the continuous whereabouts of the evidence. The mere possibility the evidence could have been tampered with or that an alteration or substitution could have been accomplished does not make the evidence inadmissible. The State is not required to exclude every possibility of tampering. However, when the evidence is fungible, . . . the importance of a proper chain of custody is enhanced. The proper showing of a chain of custody must give reasonable assurance that the property passed through the

---

[3]Debbie had moved out of the house she shared with defendant; Debbie and defendant were getting a divorce and she had sought a protective order against him; defendant argued with Debbie and fired a shot from a pistol into the floor when she left with their children after she and defendant had argued; and Debbie made a voluntary statement to the police concerning the marital and financial stress she and defendant were under prior to their divorce.

chain of custody must give reasonable assurance that the property passed through the hands of the parties in an undisturbed condition."

Gorman v. State, 463 N.E.2d 254, 256 (Ind. 1984) (citations omitted). See also Kennedy v. State, 578 N.E.2d 633, 639 (Ind. 1991). Non-fungible evidence, such as the ballistics samples, requires a less stringent foundation, because any tampering with the evidence is more likely to be noticed due to the unique character of the evidence. Hough v. State, 560 N.E.2d 511, 517 (Ind. 1990) (citing Dier v. State, 442 N.E.2d 1043, 1046 (Ind. 1982)). The proponent of the evidence does not have to establish a perfect chain of custody; any gaps in the chain of custody go to the weight of the evidence, not its admissibility. Bell v. State, 610 N.E.2d 229, 233 (Ind. 1993); Kennedy, 578 N.E.2d at 639.

We first examine the chain of custody the State established for the ballistics evidence admitted over defendant's objection.[4] Officer Taylor, the crime scene technician, collected the shell casings, sealed them in packages, and initialed the packages. Officer Ford observed Dr. Heidingsfelder, the pathologist, remove the shell casings from the bodies of Debbie Wrinkles and Mark Fulkerson during their autopsies. Officer Ford placed those casings in separate containers and marked them with his initials. To perform ballistics testings on the samples, Sergeant Wessel removed them from the sealed containers; he resealed the containers after testing. Sergeant Wessel testified at trial that he could recognize and identify the exhibits because his initials were on them.

---

[4]Defendant objected to admission of the following exhibits: shell casing found in hallway; bullet found in Fulkersons' bedroom; mutilated projectile found on front porch; shell casings found on the front porch and in the hallway; projectile imbedded in nightstand in Fulkersons' bedroom; projectiles imbedded in the Fulkersons' bed; and bullets removed from the bodies of Debbie Wrinkles and Mark Fulkerson.

Defendant objected to the introduction of the shell casings as follows:

> Well, this officer testified those particular items he looked at and tested. I haven't heard anything else about what he did after the except put them in the bags. I don't know what happened to those bags after that was done.
>
> . . .
>
> Again, I have no particular objection except for foundational reasons. And my understanding is that whomever [sic] collected these items and put them in bags then I don't know how they got from Evansville into the Indiana State Police Post, uh, and then he examined the items, they were sealed in the bag, and I don't know how they got from there to here, and then from there to Court. It's just the chain, Your Honor.

(R. at 2438-39.)

By objecting in this manner, defendant did not rebut the presumption of regularity in the handling of the exhibits, nor did he do more than raise a mere possibility of tampering. Sergeant Wessel readily identified the exhibits at trial, which establishes an adequate chain of custody for nonfungible ballistics evidence. Defendant did point to possible gaps in the chain of custody, but such gaps go to the weight to be accorded the evidence, not to its admissibility. Kennedy, 578 N.E.2d at 639. As such, we cannot find that the trial court abused its discretion in admitting the ballistics evidence over defendant's objection.

Now we turn to the chain of custody established for the serological evidence. As stated above, fungible evidence, such as blood samples, requires a more stringent foundation. The State bears an enhanced burden of showing the continuous whereabouts of the evidence. Hughett v. State, 557 N.E.2d 1015, 1019 (Ind. 1990).

Defendant objected separately on foundational grounds to the introduction of several exhibits subjected to serological testing.[5] The State offered the following to establish its continuous chain of custody for the serological evidence: Officer Taylor collected the serological evidence at the crime scene, placed all exhibits in packages, and sealed and initialed each package. Officer Ford collected blood scrapings from Debbie Wrinkles' back and legs; he placed the back and leg scrapings in separate pill boxes, which he gave to Officer Taylor, who sealed and initialed them. In addition, Officer Ford observed Dr. Heidingsfelder draw blood samples from each victim at their autopsies. Officer Ford then sealed one blood sample, marked it, and placed it in refrigeration at police headquarters before sending it off for testing; he marked the other two samples. Officer Ford also witnessed Officer VanCleave draw blood from defendant; the blood was stored in an Indiana State Police suspect evidence collection kit. The forensic serologist received all samples in sealed packages, which he resealed after testing.

Defendant's contention appears to be that the State should account second by second for each piece of serological evidence. He points to the lack of testimony regarding where the exhibits were taken after being marked by Officer Ford but before being sent to the forensic serologist for testing. Here, the State accounted for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial. This is an adequate foundation establishing a continuous chain of

---

[5]Defendant objected to the following exhibits: one bedsheet used as a curtain and one fitted bedsheet from the Fulkersons' bedroom; blood samples taken from the storm door, living room carpet, hall carpet, and bedroom carpet; blood drawn from Debbie Wrinkles and Mark and Natalie Fulkerson during their autopsies; blood sample taken from defendant and kept in an Indiana State Police suspect evidence kit; and samples of dried blood scraped from the back and legs of Debbie Wrinkles.

custody, even for fungible evidence. Defendant again did no more than raise the mere possibility of tampering, and his objections as to gaps in the chain of custody go only to the weight of the evidence, which is to be evaluated by the jury. Once more, we cannot find that the trial court abused its discretion in admitting over defendant's objection the serological evidence.

## 2. Instruction Claims

Defendant next argues that the trial court erroneously refused his tendered instructions on the defenses of accident and mistake of fact and, at the guilt phase of the trial, erroneously instructed the jury on two matters over his objections. The manner of instructing the jury lies within the sound discretion of the trial court, Tanner v. State, 471 N.E.2d 665, 667 (Ind. 1984), and we will find error reversible only if the instructions, taken as a whole, incorrectly state the law or otherwise mislead the jury. Reaves v. State, 586 N.E.2d 847, 855 (Ind. 1992). When reviewing a trial court's refusal of tendered instructions, we will find error only if: (1) the tendered instruction correctly states the law; (2) evidence in the record supports giving the instruction; and (3) no other instruction adequately covers the substance of the tendered instruction. Griffin v. State, 644 N.E.2d 561, 562 (Ind. 1994).

Accident. We first address defendant's tendered instruction on the defense of accident:

> The defense of accident has been raised as an issue in this case. In general, prohibited conduct may be excused when it is a result of accident.
> This defense contains three elements:
> 1. The conduct must have been unintentional, or without unlawful intent or evil design on the part of the accused;
> 2. The act resulting in injury must not have been an unlawful act;

3. The act must not have been done recklessly, carelessly or in wanton disregard of the consequences.

The State has the burden of disproving this defense beyond a reasonable doubt.

(R. at 134-135.)

Defendant argues that this tendered instruction correctly states the law; that no other instruction given by the trial court covered the defense of accident; and that evidence in the record exists to support giving the instruction. The State does not dispute defendant's first two contentions; therefore, we address only the issue of whether evidence in the record supports giving the instruction. Defendant refers us to his own testimony at trial that he accidentally killed Natalie Fulkerson. Defendant testified that while running through the Fulkersons' home, he ran into Natalie in the living room and his gun automatically discharged, killing her.

The third element of the defense of accident, as set forth in defendant's requested instruction, requires that the defendant not have been acting recklessly, carelessly, or in wanton disregard of the consequences of his actions. Here defendant testified that he was carrying a loaded firearm while running through the Fulkersons' home. Defendant's testimony does not support a conclusion that he was acting in a manner sufficient to establish the defense of accident. Furthermore, forensic evidence disputed defendant's claim that he shot Natalie from inside the house. For these reasons, we cannot say that the trial court erred in refusing defendant's tendered instruction on the defense of accident.

Mistake of Fact. We next address defendant's tendered instruction on the defense of mistake of fact:

> The defense of mistake of fact is defined by law as follows:
> It is a defense that the person who engaged in the prohibited conduct was reasonable [sic] mistaken about a matter of fact, if the mistake negates the culpability required for the commission of the offense.
> The reasonable mistake about a fact must have prevented the Defendant from acting intentionally, knowingly, or recklessly as those terms are defined by law.
> The State has the burden of disproving this defense beyond a reasonable doubt.

(R. at 130-131.)

Defendant argues that this instruction correctly states the law because it is based on Ind. Code § 35-41-3-7 (1993); that no other instruction given by the trial court covered the defense of mistake of fact; and that evidence in the record exists to support giving the instruction. Again, the State does not dispute defendant's first two contentions, so we address only the evidentiary issue. To support the giving of this instruction, defendant relies on his testimony at trial that he unlawfully entered the Fulkersons' home on July 21, 1994, only to take his children, Lindsey and Seth, and that he did not intend to kill anyone that night. He testified that he believed at that time that, due to the missed visitation on July 20, 1994, he would never see his children again. Defendant contends that this mistaken belief negates his intent to kill.

Mistake of fact is a valid defense if three elements are satisfied: (1) the mistake is honest and reasonable; (2) the mistake concerns a matter of fact; and (3) the mistake negates the required

culpability. Ind. Code § 35-4-1-3-7 (1993); Smith v. State, 477 N.E.2d 857, 863 (Ind. 1985) (citing

Stoner v. State, 442 N.E.2d 983 (Ind. 1982)). "[T]he burden is upon the defendant to establish an

evidentiary predicate of his mistaken belief of fact which is such that it could create a reasonable

doubt in the jury's mind that the accused had acted with the requisite mental state." Hoskins v.

State, 563 N.E.2d 571, 575 (Ind. 1990) (citing Stoner, 442 N.E.2d 983). Here, defendant was

charged with the "knowing" murders of Debbie Wrinkles and Mark and Natalie Fulkerson. The

culpability required was an awareness of the high probability that defendant was killing the victims.

Ind. Code § 35-41-2-2 (1993). It is unclear how defendant's belief that he would never see his

children again could negate an awareness of the high probability that his actions would result in the

deaths of three people.

None of the evidence adduced at trial, other than a portion of defendant's testimony,

supported an instruction on the defense of mistake of fact. Defendant testified at trial that he

intended to hit Mark Fulkerson when he shot at Mark, and that he knew it was possible that Debbie

would die from his shooting her. In a similar context, this Court has held that such a mistaken belief

"does not satisfy the requirement that [defendant's] culpability be negated because even if believed,

it would not have created in the jury's mind a reasonable doubt that [defendant] was unaware that

he pointed his gun at [the intended victim] and pulled the trigger [multiple] times or that he was

unaware of the probable consequences that his conduct could have." Hoskins, 563 N.E.2d at 576.[6]

___

[6]The defendant in Hoskins was charged with attempted murder; he argued that "the acts of the three victims created in him the mistaken belief that one of the women had a gun and that he was in more danger than he actually was." Hoskins v. State, 563 N.E.2d 571, 576 (Ind. 1990).

We conclude that the trial court could find that there was no evidentiary basis for defendant's tendered instruction on the defense of mistake of fact.

Reckless Homicide Instruction. Defendant also challenges the court's final instruction number eight:

> The crime of Reckless Homicide is defined by statute as follows:
> A person who recklessly kills another human being commits Reckless Homicide, a Class C felony.
> To convict the Defendant, the State must have proved each of the following elements in each Count:
> The Defendant
> 1. recklessly
> 2. killed
> 3. Debra Wrinkles in Count I, Natalie Fulkerson in Count II and Mark A Fulkerson in Count III.
> If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty.
> If the State did prove each of these elements beyond a reasonable doubt in each Count, you should find the Defendant guilty of Reckless Homicide, a Class C felony, in that Count.

(R. at 148.) Defendant objected to this instruction on the grounds that it misled the jury as to the State's burden of proof.[7] Defendant argues that, while lawyers would "know what the trial court meant[,] . . . the instruction is highly confusing as to when a verdict of guilty of Reckless Homicide could be returned . . . [and] the jury could have easily believed that a verdict of guilty of Reckless

_____

[7] "And with Instruction number 8, it would be the second, third sentence I guess. It says, to convict the Defendant - it should have said, in each Count - the State must have proved each of the following elements . . . . And then it says, if the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty - in each Count. And finally, if the State did not prove each of these elements beyond a reasonable doubt you should find the Defendant guilty of Reckless Homicide, a Class C felony, in each Count. That's the record I'd like to make at this time." (R. at 220-21) (emphasis added).

Homicide could not be returned with reference to the death of [one of the victims] . . . since the evidence did not establish the essential elements of that offense as to the other two victims." Br. of Appellant at 73.

Whatever the merits of defendant's claim that the jury could have been misled by this instruction, we conclude that the record demonstrates that it was not misled. The trial court's preliminary instructions to the jury clearly delineated the charges against defendant. The language in the Reckless Homicide instruction to which defendant objects also adequately distinguished among the three separate charges.[8] Furthermore, the jury received separate verdict forms for each count with which defendant was charged to aid in its deliberations. Each verdict form contained four options: The jury could find defendant guilty of Murder, Voluntary Manslaughter, or Reckless Homicide, or not guilty with respect to each victim. These separate verdict forms would have allayed any possible confusion that might have resulted from the court's instruction on Reckless Homicide. Accordingly, we find that the trial court did not abuse its discretion in giving the instruction on Reckless Homicide over defendant's objections.

Prior Inconsistent Statements. Defendant next argues that the trial court's instruction on prior inconsistent statements incorrectly states the law because it informs the jury that it may consider prior inconsistent statements as substantive evidence:

> Prior inconsistent statements are defined as statements made by the

---

[8]"If the State did prove each of these elements beyond a reasonable doubt in each Count, you should find the Defendant guilty of Reckless Homicide, a Class C felony, in that Count." (R. at 148) (emphasis added).

witness out of Court which differ from his or her testimony during this trial. Prior inconsistent statements may be considered by you for two purposes. You may use them to impeach the capacity for truthfulness of the witness who made the inconsistent statement. You may also consider the out-of-Court statements as evidence in determining the guilt or innocence of the Defendant of the crime charged.

(R. at 153.)

Defendant objected to the giving of this instruction as follows:

With respect to the Court's Final Instruction number 13 in the guilt phase, this instruction is an incorrect statement of the law in that impeachment evidence may be considered as substantive evidence of guilt only in limited circumstances not set out in the instruction.

(R. at 223.)

The given instruction is a verbatim recitation of Indiana Criminal Pattern Jury Instruction 12.19, which was superseded by Evid.R. 801(d) and Modesitt v. State, 578 N.E.2d 649 (Ind. 1991). See Cooley v. State, 682 N.E.2d 1277, 1281 (Ind. 1997) (discussion of reasons for replacing rule of Patterson v. State, 263 Ind. 55, 324 N.E.2d 482 (1975), with that of Evid.R. 801(d) and Modesitt). The instruction incorrectly stated the law, and the trial court committed error when it instructed the jury in this manner. Johnston v. State, 230 Ind. 571, 575, 105 N.E.2d 820, 821 (1952) (error to give instruction which incorrectly states the law); Beneks v. State, 208 Ind. 317, 328, 196 N.E. 73, 77 (1935) (same). However, it is not clear to us that defendant's objection was on this basis. Moreover, error in a particular instruction will not justify reversal where, as here, there has been no showing that the defendant's rights were substantially prejudiced. Hensley v. State, 499 N.E.2d 1125, 1127 (Ind. 1986). Here, defendant does not set forth any prior inconsistent statement in the

record which the jury could have considered improperly as substantive evidence. "[I]t is the responsibility of [defendant] to support his argument on appeal with appropriate citations to legal authorities as well as to appropriate sections of the record." Marshall v. State, 621 N.E.2d 308, 318 (Ind. 1993) (citing Bieghler v. State, 481 N.E.2d 78 (Ind. 1985)). See also Ind.Appellate Rule 8.3(A)(7). Without a demonstration by defendant of prejudice in general, and with no citation to any prior inconsistent statement in particular, we consider this error harmless.

Constitutionality of the Death Penalty

Defendant attacks the constitutionality of Indiana's death penalty statute, Ind. Code § 35-50-2-9, on several grounds: (1) the jury impermissibly decides arbitrarily between recommending a sentence of death or life imprisonment without parole for a given defendant; (2) the death penalty is impermissibly disproportionate punishment for "knowing" murders; (3) the entire capital sentencing structure violates due process because it misleads the jury as to its role in the sentencing process; (4) the mitigating circumstance of "no significant history of prior criminal conduct" is unconstitutionally vague; and (5) the sentencing judge impermissibly cannot review meaningfully the jury's sentencing recommendation because the jury is not required to make specific written findings of the aggravating and mitigating circumstances it relied on in reaching its decision.

Lack of Discretion. From its enactment in 1977 until 1993, the Indiana death penalty statute

authorized a death sentence to be imposed when specific criteria in the statute had been satisfied.[9] In 1993, the statute was amended to authorize either a sentence of death or a sentence of life without parole to be imposed when those criteria have been satisfied.[10] The 1993 amendment created no additional criteria to be used to determine when death rather than life without parole is appropriate.

Relying on language in the Furman v. Georgia and Gregg v. Georgia opinions[11] condemning as unconstitutional "unfettered discretion" in death sentencing statutes, defendant argues that the 1993 amendment rendered the Indiana death penalty statute unconstitutional by giving the Indiana sentencer "unfettered discretion" to choose between death and life without parole.

Assessing slightly different arguments, we reject a similar constitutional claim today in Stevens v. State, No. 79S00-9507-DP-828 (Ind. Dec. 31, 1997). Prior to the 1993 amendments, while a death sentence was authorized to be imposed when the criteria specified in the statute were

---

[9] Ind. Code § 35-50-2-9, enacted by 1977 Ind. Acts P.L. 340, § 122; as amended by 1983 Ind. Acts P.L. 336, § 1; as amended by 1986 Ind. Acts P.L. 212, § 1; as amended by 1987 Ind. Acts P.L. 320, § 2; as amended by 1989 Ind. Acts P.L. 296, § 2; as amended by 1989 Ind. Acts P.L. 138, § 6; as amended by 1990 Ind. Acts P.L. 1, § 354.

[10] 1993 Ind. Acts P.L. 250 § 2. The statute has been amended subsequently in ways not material to the analysis of this issue. See 1993 Ind. Acts P.L. 230 § 5; 1994 Ind. Acts P.L. 158 § 7; 1995 Ind. Acts P.L. 306 § 1; 1996 Ind. Acts P.L. 228 § 1; 1996 Ind. Acts P.L. 216 § 25. As noted in note 2, supra, Ind. Code § 35-50-2-9 as amended in 1994 governs this case.

[11] Defendant cites to Furman v. Georgia, 408 U.S. 238, 309-10 (1972) (Stewart, J., concurring); id. at 314 (White, J., concurring); Gregg v. Georgia, 428 U.S. 153, 189, 195 (1976) (opinion of Stewart, J., with two other justices concurring).

met, a death sentence was not required to be imposed;[12] the sentencer had (and still has) discretion to impose imprisonment for a term of years. If there was no constitutional defect prior to the 1993 amendment, as defendant appears to contend, in the sentencer having the discretion to impose a term of years rather than death, then we see no new defect occasioned by the sentencer having the additional discretion to impose life without parole rather than death. See Furman v. Georgia, 408 U.S. 238 (1972).

For a death penalty statute to be constitutional in this context, the statute must "establish a threshold below which the [death] penalty cannot be imposed." Romano v. Oklahoma, 512 U.S. 1, 6 (1994) (quoting McCleskey v. Kemp, 481 U.S. 279, 305 (1987)).[13] To meet this threshold, the statute must contain "rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." McCleskey, 481 U.S. at 305. The statute must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877 (1983). The statute must limit the decisionmaker's discretion "so as to minimize the risk of wholly arbitrary and capricious action." Zant, 462 U.S. at 874.

---

[12]Indeed, a sentencing scheme that would require death to be imposed would be unconstitutional. Sumner v. Shuman, 483 U.S. 66 (1987); see also Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (opinion of Stewart, J., with two other justices concurring).

[13]A second requirement is that the statute ensure that the sentencing body bases its decision on the character of the individual defendant and on the nature of the offense(s) he or she committed. Romano v. Oklahoma, 512 U.S. 1, 7 (1994) (citing McCleskey v. Kemp, 481 U.S. 279, 302 (1987)). Defendant also challenges this facet of Indiana's death penalty statute, and we address the issue infra.

The Indiana death penalty statute, Ind. Code § 35-50-2-9, meets these requirements. After a defendant is convicted of Murder, the State must prove beyond a reasonable doubt the existence of at least one aggravating circumstance listed in the statute before that defendant becomes eligible for the death penalty. Ind. Code § 35-50-2-9(a) & (b). After the jury determines that the State has met its burden of proof, it must balance the aggravating and any mitigating circumstances and find that the aggravating factors outweigh the mitigating factors before it can recommend a sentence. Ind. Code § 35-50-2-9(i). In deciding whether to follow the jury's recommendation, the trial court, which has the authority to impose the sentence, must follow the same process as did the jury in reaching its recommendation. Ind. Code § 35-50-2-9(g), (i).

The additional sentencing option of life without parole merely affords the jury another opportunity to narrow the class of defendants eligible for the death penalty, and "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . [it] then is free to consider a myriad of factors to determine whether death is the appropriate punishment." California v. Ramos, 463 U.S. 992, 1008 (1983). Accordingly, we find that Indiana's death penalty statute constitutionally permits a sentence of death or life imprisonment without parole.

Proportionality. Defendant was charged with and convicted of the "knowing" murders of Debbie Wrinkles, Mark Fulkerson, and Natalie Fulkerson. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b) (1993). The trial court sentenced defendant to death based on its finding that

the State proved beyond a reasonable doubt the existence of the multiple murder statutory aggravator,[14] thus making defendant eligible for the death penalty. Ind. Code § 35-50-2-9(a). As such, neither the jury nor the judge was called upon to make a discrete determination that any of the killings were "intentional."[15] Defendant argues that imposing the death penalty for "knowing," as opposed to "intentional," murder is unconstitutional under the Eighth Amendment to the United States Constitution and Article I, Section 16, of the Indiana Constitution.

Defendant does not ground his state constitutional claim in an analysis of the text or history of Article I, Section 16. Instead, he contends that the legislature, from passage of the state constitution until 1977, only authorized the imposition of the death penalty for "intentional" murders and felony murders.[16] This indicates, he argues, that imposition of the death penalty for "knowing" murders (a mental state less culpable than "intentional") must have been considered to violate the Article I, Section 16, requirement that "[a]ll penalties shall be proportioned to the nature of the offense."

Whatever we may properly infer from legislative enactments in conducting constitutional

---

[14]"The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder." Ind. Code § 35-50-2-9(b)(8).

[15]"A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (1993).

[16]Br. of Appellant at 32-33. Defendant broadly traces the history of Indiana's death penalty statute, starting with Chapter XXXVII, § 3 of General Laws of the State (1881) ("Whoever, purposely and with premeditated malice, or in the perpetration of [certain felonies] . . ."), continuing to Ind. Stat. Ann. § 10-3401 (Michie 1941) (same), and finishing with Ind. Code § 35-13-4-1 (1973) (same).

exegesis, we do not find the statutes cited here to support defendant's claim. As defendant acknowledges, those statutes all permitted the imposition of the death penalty in cases of felony murder. But in felony murder, there is no culpability requirement at all, i.e., a mental state less culpable than "knowing."

We addressed a similar claim brought under the federal constitution in Baird v. State, 604 N.E.2d 1170 (Ind. 1992). There we held that imposing a sentence of death for the commission of multiple "knowing" murders was not unconstitutional. We reasoned in Baird that the defendant's "death sentence rest[ed] on the multiple formations of a highly culpable 'knowing' state of mind resulting in multiple murders . . . ." Baird, 604 N.E.2d at 1184. The defendant in Baird did not receive the death penalty simply because he had committed "knowing" murders, but because he had committed multiple murders, thus making himself eligible for the death penalty. See Ind. Code § 35-50-2-9(b)(8).

Our decision in Baird comports with the Supreme Court's treatment of the issue of the degree of culpability necessary to support a death sentence in Tison v. Arizona, 481 U.S. 137 (1987). The defendants in Tison were two brothers convicted of capital murder under Arizona's felony-murder and accomplice-liability statutes.[17] The Tison brothers challenged their death sen-

---

[17]The Tison brothers actively participated in engineering their father's and his cell mate's escape from prison; flagging down and stealing a getaway car; and kidnaping the car's driver and three passengers. The father and his cell mate shot and killed the four kidnap victims while the brothers stood by and did nothing to halt the murders.

tences on the ground that the Supreme Court's holding in Enmund v. Florida, 458 U.S. 782 (1982),[18] required a finding of intent to kill before a court could impose the death penalty. The Court stated that "[a] narrow focus on the question of whether or not a given defendant 'intended to kill,' however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers." Tison, 481 U.S. at 157. The Court went on to hold that the "reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." Id. at 157-58.

Here, defendant does not argue that he was convicted wrongly of "knowing" murders. Rather, he challenges the constitutionality of Indiana's death penalty statute as it applies to "knowing" murders. Tison holds that a death sentence is permissible where, despite no finding of intent to kill, the defendant nonetheless has demonstrated a highly culpable mental state. Such is the case here, where the court imposed the death sentence based on the State's proving beyond a reasonable doubt the existence of the multiple murder statutory aggravator.

Jury Role. Defendant contends that Indiana's capital sentencing structure unconstitutionally misleads the jury into believing its role in the sentencing process is merely advisory in violation of the

---

[18]Enmund drove the getaway car in an armed robbery that resulted in a double murder. Enmund was convicted and sentenced to death under Florida's felony-murder rule. The Supreme Court reversed Enmund's death sentence, finding a lack of intent to kill because Enmund's role in the robbery was too remote in relation to the murders, and the culpability of those who committed the murders and robbery was not attributable to him.

Supreme Court's holding in Caldwell v. Mississippi, 472 U.S. 320 (1985). In Caldwell, the prosecutor implied to the jury that its decision to impose the death penalty carried little import because the death sentence was immediately reviewable by an appellate court. The Court held that it is unconstitutional for a judge to follow the sentencing recommendation of a jury who believes its role is merely advisory and that the defendant's fate ultimately rests elsewhere. Caldwell, 472 U.S. 320.

This Court has addressed previously the issue defendant raises today—that the language of Indiana's death penalty statute confuses the average lay juror as to his or her role in the sentencing process. In Miller v. State, 623 N.E.2d 403 (Ind. 1993), this Court distinguished a claim similar to defendant's from the Caldwell holding by noting that "we are not dealing with comments made by the prosecuting attorney but are dealing with the structure of a statute which delegates to the jury the role of examining the evidence and making a recommendation to the trial judge concerning the sentence. In Caldwell, the actual responsibility for the death penalty, although reviewable on appeal, was a final determination at the trial level by the jury. In Indiana, all concerned are fully advised that the jury's examination of the evidence and recommendation is for the edification of the trial judge who has the ultimate responsibility in imposing the sentence." Miller, 623 N.E.2d at 410-11. An Indiana jury does not determine a sentence, but only makes a sentencing recommendation. The trial court decides whether to impose a sentence of life imprisonment without parole or the death penalty. It is not error to inform the jury that its sentencing decision is a recommendation, because this is a correct statement of Indiana law. See Holmes v. State, 671 N.E.2d 841, 855 (Ind. 1996), cert. denied, 118 S.Ct. 1137 (1997). Ind. Code § 35-50-2-9 is not susceptible to a Caldwell claim of the sort defendant advances, and we accordingly reject defendant's contention.

Prior Criminal History Mitigator. Defendant attacks the "no significant history of prior criminal conduct" mitigator[19] as "fail[ing] to adequately guide the sentencer's discretion because it is vague and meaningless, allows consideration of unreliable information, and precludes consideration of relevant mitigation evidence."[20] Br. of Appellant at 39. Before analyzing defendant's claim, we note that the trial court specifically found this mitigating factor to exist and used it in the statutory balancing process required by Ind. Code § 35-50-2-9(i) before deciding to follow the jury's recommendation to impose the death sentence.

The Supreme Court expressly approved the use of this mitigating factor in Proffitt v. Florida, 428 U.S. 242 (1976).[21] The petitioner in Proffitt argued that the aggravating and mitigating factors in Florida's capital sentencing scheme were overly broad, and that neither judge nor jury could determine whether a defendant had a "significant history of prior criminal activity."[22] The Court acknowledged that making this decision is difficult, but that it "require[s] no more line drawing than is commonly required of a factfinder in a lawsuit." Proffitt, 428 U.S. at 257 (rejecting petitioner's challenge to several statutory aggravating and mitigating factors). Under this statutory scheme, the "trial court's sentencing discretion is guided and channeled by a system that focuses on the circum-

---

[19]Ind. Code § 35-50-2-9(c)(1) (1993).

[20]We previously rejected a similar claim against the statutory provisions generally concerning aggravating and mitigating factors. Harrison v. State, 644 N.E.2d 1243, 1258 (Ind. 1995).

[21]The Florida death penalty statute upheld in Proffitt v. Florida, 428 U.S. 242 (1976), is substantially similar to Indiana's death penalty statute. See Brewer v. State, 417 N.E.2d 889, 897 (Ind. 1981) (comparative analysis of Florida and Indiana death penalty statutes); Judy v. State, 416 N.E.2d 95, 107 (Ind. 1981) (same).

[22]Fla. Stat. Ann. § 921.141(6) (Supp. 1976-1977).

stances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." Id. at 258.

Based on the Supreme Court's upholding of a similar mitigating factor in Florida's capital sentencing scheme, and on the trial court's finding this mitigator to exist in defendant's case, we hold that the "no significant history of prior criminal conduct" is not unconstitutionally vague, and that defendant was prejudiced in no way by the trial court's consideration of that mitigator during the sentencing process.

Jury Findings. Defendant's final constitutional argument is that Indiana's capital sentencing structure is unconstitutionally unreliable in violation of the Eighth Amendment of the United States Constitution because the jury is not required to produce written findings of the specific aggravating and mitigating factors it relied on in reaching its decision to recommend the death penalty. To support this argument, defendant analogizes the heightened role of a jury in a capital case to the role of the sentencing judge who is required to make specific written findings of aggravators and mitigators before imposing an enhanced sentence.[23] Defendant contends that the trial court judge cannot review meaningfully, and decide whether to follow, the jury's recommendation unless the jury has made specific written findings regarding the balancing process in which it engaged.

This Court has rejected the requirement of written findings for juries in capital cases. "While

---

[23]Battles v. State, 49S00-9608-CR-532, 1997 WL 729099, at *5 (Ind. Nov. 24, 1997); Jones v. State, 675 N.E.2d 1084, 1087 (Ind. 1996).

the trial court must consider the jury's recommendation and its sentence must be based on the same standards that the jury was required to consider, we perceive nothing of a constitutional dimension that would require the trial court to have the details of the jury's deliberations before it in discharging these statutory obligations." Harrison v. State, 644 N.E.2d 1243, 1259 n.28 (Ind. 1995). See also Martinez Chavez v. State, 534 N.E.2d 731, 734 (Ind. 1989). We decline to revisit further this issue.

## Death Sentence Review

The Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind. Const. art. VII, § 4. Although our rules for appellate review of sentences require that great deference be given to the judgment of the trial court, e.g., Ind.Appellate Rule 17, where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." Spranger v. State, 498 N.E.2d 931, 947 n.2 (Ind. 1986). In fact, we have made it clear that "this Court's review of capital cases under Article 7 is part and parcel of the sentencing process." Cooper v. State, 540 N.E.2d 1216, 1218 (Ind. 1989).

This special review of death sentences is grounded in the Indiana Constitution, our state's death penalty statute, and federal death penalty jurisprudence. Harrison, 644 N.E.2d at 1260. The United States Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" Caldwell v. Mississippi, 472 U.S. at 329 (quoting Califor-

nia v. Ramos, 463 U.S. at 998-99). Meaningful appellate review of death sentences plays a crucial role in ensuring that the death penalty is not imposed arbitrarily or irrationally. Parker v. Dugger, 498 U.S. 308, 321 (1991); Gregg v. Georgia, 428 U.S. 153, 204-06 (1976).

Penalty Phase. Our death penalty statute guides our review of death sentences by setting forth standards governing trial court imposition of death sentences. Following completion of the guilt phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. Before a death sentence can be imposed, our death penalty statute requires the State to prove beyond a reasonable doubt at least one aggravating circumstance listed in subsections (b)(1) through (b)(12) of the statute. Ind. Code § 35-50-2-9. Here the State supported its request for the death penalty with the aggravator listed in subsection (b)(8): "The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder."[24] Id. To prove the existence of this aggravating circumstance at the penalty phase of the trial, the State incorporated by reference all of the evidence from the earlier guilt phase of the trial (with respect to which the jury had found defendant guilty of the three murders).

The death penalty statute requires that any mitigating circumstances be weighed against any properly proven aggravating circumstances. In addition to mitigating circumstances supported by the guilt phase evidence (in particular, the extensive testimony of clinical psychologist Dr. Eric S.

---

[24] We have held that this aggravator is available only in cases in which the defendant is tried in the same proceeding for the multiple murders alleged in the aggravating circumstances. Williams v. State, 669 N.E.2d 1372, 1389 (Ind. 1996), reh'g denied, cert. denied, 117 S.Ct. 1828, (1997); State v. McCormick, 272 Ind. 272, 278, 397 N.E.2d 276, 280 (1979).

Engum as to defendant's personality disorders and drug abuse), defendant offered the testimony of four witnesses during the penalty phase. Three — Mary Winnecke (the mother of Natalie Fulkerson and legal guardian of the Fulkersons' children, Matthew and Kim), Carolyn Casper (a relative by marriage of Debbie Wrinkles and guardian of the Wrinkles's children, Lindsey and Seth) and Lindsey Wrinkles (defendant's fourteen-year-old daughter) — testified from their perspectives as victims of defendant's crimes that they did not desire defendant to be sentenced to death.

Defendant argues that during this phase of the trial, the court erroneously admitted victim impact evidence over his objection. This Court has held that victim impact evidence is admissible in the penalty phase of a trial only if it is relevant to one or more of the statutory aggravating factors argued by the State. Bivins v. State, 642 N.E.2d 928 (Ind. 1994).

The victim impact testimony which defendant contends was admitted in error consisted of the testimony of Mary Winnecke regarding the effect of the murders on Matthew Fulkerson (prosecutor questioning):[25]

> Q. What effect has this had on Matthew?
>    BY MR. VOWELS [defense counsel]: To which I would object. I believe that if the jury is allowed to consider that information that they may be so prejudiced that they will not render a fair trial to my client, denying him of his due process rights, his right to a fair trial. Can you think of anything else I should add to that? That's my objection.
>    BY THE COURT: Mr. Levco?
>    BY MR. LEVCO [prosecutor]: I don't wish to argue.
>    BY THE COURT: Objection overruled.

---

[25]Testimony from Lindsey Wrinkles and defendant tends to show that Matthew witnessed defendant shooting Mark Fulkerson, Matthew's father.

Q. You can answer the questions.

A. How is Matthew?

Q. How has this affected Matthew, if at all?

A. Uh, Matthew won't stay in a room and watch television alone. If I walk into the kitchen to fix supper and Matthew's watchin' cartoons and is just right around the wall, uh, he'll yell, Granny, there's nobody here with me. And I'll say, well, honey, I'm right her [sic] cookin' supper. And Matthew will say, but I'm all by myself. And he won't stay in a room by himself. And gets up every night and he gets in bed with us, or else he sleeps on a pallet. Some nights, I just — I have a pallet right by my bed and he'll lay there and I'll have my hand right on him. Uh, he woke up one night and he came in our room and he just — that child shook. And he said, Granny . . . (WITNESS CRYING) . . . I thought I heard Eric [defendant] in the house. And I said, baby, you're all right. I held him and I put him between me and Bob. Because, when he gets in bed with us, he just kinda climbs over me and lays right there. And he laid — I had my arm like this (WITNESS INDICAT-ING) and Bob scooted over against him and we both held him and he just shook. And then he said he had to go to the bathroom and he had diarrhea. It's like I sat there by him and I held him, while he's sittin' on the pot, and he just shook and he cried. And so I put him back in bed and he still shook and he cried. And I said, Matthew, do you wanna go talk about it? And I said, let's go out in the living room. So, we went out and we turned on the lights and I sat in my rocker and I held him and we talked. And he cried and I just — and I said, Matthew, do you wanna go back in the bedroom by grandpa? So, we did. He, uh, if I got to put him to bed, and he shares a room with my 21-year old son, uh, and if Adam goes out of the room or if I put him on the pallet to go to sleep and Bob's in there and Bob gets up to go get a drink of water and Matthew's not asleep, Matthew will come right back out. I mean, he just — Matthew won't stay in a room by himself. Uh, I've gotten him so he'll go outside. Uh, last year we couldn't get him — it's been over the winter that Matthew will even go out in the yard and see outside by himself. He's confident enough for that.

(R. at 3211-3214.)

We might well find this testimony violative of <u>Bivins</u> had the prosecutor presented it on direct examination. However, we find no error in its admission here because the State elicited the testimony from Mary Winnecke on cross-examination after defendant called her to testify at sentencing

on his behalf. Winnecke's testimony against the death penalty for the defendant after he had killed her daughter and after she had witnessed firsthand the effects of the murder on her grandson was in effect an argument that death should not be imposed because of a lack of victim impact (or, at least, because of a lack of victim support for the penalty).[26] This the State was entitled to rebut.

The fourth witness called by the defendant at the penalty phase was a mitigation specialist engaged on defendant's behalf. The witness testified as to defendant's upbringing in a violent and otherwise dysfunctional family and as to the adverse impact of drug and alcohol abuse on defendant's mental condition. Following the presentation of this evidence, both sides made closing arguments.

At the conclusion of this phase of the trial, the trial court instructed the jury. Defendant claims that the trial court erred in failing to give an instruction on all of the available statutory penalties for Murder, i.e., that defendant could be sentenced to a term of years as an alternative to death or life without parole. Defendant did not object to the court's failure to instruct the jury, and he further posits that he was not required to have tendered a competing instruction because it is the affirmative duty of the trial court to instruct the jury in this manner. See Ind. Code § 35-50-2-9(d) (1993) ("The court shall instruct the jury concerning the statutory penalties for murder and any other offenses for which the defendant was convicted, the potential for consecutive or concurrent sentencing and the availability of good time credit and clemency." (emphasis supplied).)[27]

---

[26]Winnecke testified that her categorical opposition to the death penalty is rooted in her religious belief system.

[27]In addition to the duty imposed by Ind. Code § 35-50-2-9(d), the trial court must also instruct the jury on all matters of law necessary for their information in reaching a verdict. Ind. Code

Generally, a defendant waives a claim of instructional omission if he fails to object and tender a competing instruction at trial, Mitchem v. State, 685 N.E.2d 671, 674 (Ind. 1997), unless the alleged error constitutes fundamental error. Sanchez v. State, 675 N.E.2d 306, 308 (Ind. 1996). "In order to rise to the level of fundamental error, the error must constitute a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and apparent. A claim of fundamental error is not viable absent a showing of grave peril and the possible effect on the jury's decision. We consider the jury instructions as a whole, and in reference to each other." Isom v. State, 651 N.E.2d 1151, 1152 (Ind. 1995), reh'g denied (citations and internal quotation marks omitted).

Upon our examination of the instructions as a whole, we agree with defendant that the trial court did not instruct the jury on all of the statutory penalties for Murder and other matters required by Ind. Code § 35-50-2-9(d).[28] However, we find no reversible error for four reasons. First, we cannot say that counsel's failure to object to the absence of such an instruction was not tactical, inasmuch as appellants in capital cases have claimed error in the past in giving such instructions. See, e.g., Timberlake v. State, No. 49S00-9305-DP-577, slip op. at 18 (Ind. Dec. 30, 1997);

---

§ 35-37-2-2(5) (1993). Speaking to the predecessor to § 35-37-2-2, this Court held that the statute "does not relieve a party from submitting desired instructions, if the court, through oversight or otherwise, fails to instruct as fully as a party desired. Counsel, knowing the court is omitting the instruction upon some point in the case, may not remain quiet and tender no instruction and afterwards claim the court erred. Such practice would be wrong and mischievous." Barker v. State, 238 Ind. 271, 277, 150 N.E.2d 680, 683 (1958).

[28]During the penalty phase, the trial court instructed the jury on penalties as follows: "You are to consider both aggravating and mitigating circumstances and recommend whether the death penalty, life imprisonment without parole, or neither, should be imposed." (R. at 173; 189.)

Holmes, 671 N.E.2d at 856; Fleenor v. State, 622 N.E.2d 140, 145 (Ind. 1993). Second, during their closing arguments during the penalty phase, both the prosecutor and defense counsel referred to the trial court's authority to impose imprisonment for a term of years as a sentence in this case and both indicated that if the court elected that option, it was unlikely that the defendant would ever be released from prison. Third, prior to the legislature requiring instruction on the range of penalties,[29] we held it within the discretion of the trial court to refuse a defendant's request for such instruction. Burris, 465 N.E.2d at 188. Fourth, the jury was instructed that it had the option of recommending life without parole as an alternative to a sentence of death. Having recommended death notwithstanding the life without parole option, we reject defendant's argument that the jury might have recommended imprisonment for a term of years had it been instructed on its availability. We believe this omission does not rise to the level of fundamental error.

The jury subsequently returned a unanimous recommendation that a sentence of death be imposed.

Trial Court Sentencing Determination. Once the jury has made its recommendation, the jury is dismissed, and the trial court has the duty of making the final sentencing determination. First, the trial court must find that the State has proven beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Ind. Code § 35-50-2-9(i)(1). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the

---

[29]The legislature added this provision to the death penalty statute in 1993. 1993 Ind. Acts P.L. 250 § 2.

aggravating circumstance or circumstances. Ind. Code § 35-50-2-9(i)(2). Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. Ind. Code § 35-50-2-9(e). The trial court must make a record of its reasons for selecting the sentence that it imposes. Ind. Code § 35-38-1-3.

These statutory provisions make clear that the sentencing court has a separate and independent role in assessing and weighing the aggravating and mitigating circumstances and in making the final determination whether to impose the death penalty. Benirschke v. State, 577 N.E.2d 576, 579 (Ind. 1991). In arriving at its own separate determination as to whether the death penalty is an appropriate punishment, the sentencing court is to point out its employment of this process in specific and clear findings. Id. The trial court's statement of reasons (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, Benirschke, 577 N.E.2d at 579; Evans v. State, 563 N.E.2d 1251, 1254 (Ind. 1990), and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime. Benirschke, 577 N.E.2d at 579; Woods v. State, 547 N.E.2d 772, 793 (Ind. 1989). The requirements for sentencing findings are more stringent in capital cases than in non-capital sentencing situations. Evans, 563 N.E.2d at 1254.

In imposing the death sentence, the trial court found that the State proved beyond a reasonable doubt one of the aggravating circumstances listed in the death penalty statute — that the

defendant had committed another murder, to wit, the three murders in this case. The record and the law supports this finding.

The trial court found four mitigating circumstances to exist: (i) defendant had no significant history of prior criminal activity; (ii) defendant was under the influence of extreme mental and emotional disturbance at the time the three murders were committed; (iii) defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law may have been substantially impaired at the time of the murders because of his abuse of meth-amphetamines; and (iv) defendant grew up in a dysfunctional family which may have been responsible for mental or emotional disturbance.

As required by our death penalty statute, the trial court found that the mitigating circum-stances that existed were outweighed by the aggravating circumstance. The trial court also gave consideration to the jury's recommendation and set forth its personal conclusion that the sentence was appropriate punishment for this offender and this crime. We find that the sentencing order entered by the trial court here suffices to meet the requirements imposed by statute and case law.[30]

---

[30]In doing so, we reject defendant's contention that the sentencing order is deficient in four respects.

First, defendant argues that the trial court provided insufficient support for its conclusion that the multiple murder aggravator had been proved beyond a reasonable doubt. We find such support in the trial court's finding that the jury convicted the defendant of the three murders listed in the aggravator.

Second, defendant argues that the four mitigating circumstances found by the trial court were supported only with "bare-boned" conclusions. While these findings could have been supported in greater detail, they did refer to specific aspects of defendant's upbringing and drug abuse. We find them adequate.

Third, defendant appears to argue that the trial court failed to articulate the specific weight

Based on our review of the record and the law, we agree that the State has proven beyond a reasonable doubt an aggravating circumstance authorized by our death penalty statute and that the mitigating circumstances that exist are outweighed by the aggravating circumstance. We conclude that the death penalty is appropriate for defendant's murder of Debbie Wrinkles, Natalie Fulkerson and Mark Anthony Fulkerson.[31] We further find this sentence to be proportionate not only to the nature of the offenses and the character of the defendant, but also to the sentences approved for capital Murder in other Indiana cases. See, e.g., Matheney v. State, 45S00-9207-PD-584, 1997 WL 731610 (Ind. Nov. 25, 1997); Prowell v. State, 82S00-9407-DP-666, 1997 WL 684071 (Ind. Nov. 4, 1997); Baird, 604 N.E.2d 1170; Conner v. State, 580 N.E.2d 214 (Ind. 1991).

## Conclusion

Defendant's convictions and death sentence are affirmed.

SHEPARD, C.J., and DICKSON, SELBY, and BOEHM, JJ., concur.

---

it assigned to the aggravating circumstance and the mitigating circumstances. While such an articulation is welcome, it is sufficient for purposes of both the statute and our review for the trial court to indicate that it has engaged in the weighing of the aggravators and mitigators as required by statute and that the aggravators outweigh the mitigators. That standard was met here.

Lastly, defendant argues that the trial court did not set forth its personal conclusion that the death sentence was appropriate for this offender and this crime. We find such a conclusion in the following excerpt from its findings: "The Court . . . now . . . finds that the imposition of the death penalty as to the Defendant, Matthew E. Wrinkles, is appropriate and proper . . . ."

[31]In reaching this conclusion, we have considered the arguments made to us in this appeal to the effect that the death penalty is not appropriate in light of the nature of the offense and the character of the defendant. Br. of Appellant at 80-85.