## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 16 2019, 6:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.W., B.W., and D.W. (Minor Children), and D.W. (Father), | January 16, 2019 |
| | Court of Appeals Case No. 18A-JT-1488 |
| *Appellant-Respondent,* | Appeal from the Marion Superior Court Juvenile Division |
| v. | The Honorable Marilyn A. Moores, Judge |
| Indiana Department of Child Services and Child Advocates, Inc. | The Honorable Gary Chavers, Judge Pro Tempore |
| *Appellees-Petitioners* | The Honorable Larry Bradley, Magistrate |
| | Trial Court Cause No. 49D09-1708-JT-702, 49D09-1708-JT-705, 49D09-1708-JT-706 |

**Altice, Judge.**

### Case Summary

[1] D.W. (Father) appeals the involuntary termination of his parental rights to his three children. On appeal, Father argues that the court's termination order is not supported by sufficient evidence.

[2] We affirm.

### Facts & Procedural History

[3] Father and S.T. (Mother)[1] have three children: A.W., born in 2008; D.W., born in 2012; and B.W., born in 2014 (collectively, the Children). The Department of Child Services (DCS) became involved with the family in May 2016 after a police officer observed Father and Mother buying heroin with D.W. and B.W. in the car. A police officer initiated a traffic stop. The officer found narcotics in Mother's bra and determined that Father was driving on a suspended license. The officer also noted that D.W. was not restrained in a car seat and was "wearing a sagging urine filled diaper and was shoeless" and that both children were covered in dirt. *Exhibits* at 21. Father was arrested as a result of this incident, and D.W. and B.W. were placed in foster care.

---

[1] Mother's parental rights were not terminated by the order terminating Father's parental rights. We will state the facts as they pertain to the termination of Father's parental rights.

[4]     On May 17, 2016, DCS filed a verified petition alleging D.W. and B.W. to be children in need of services (CHINS). On July 11, 2016, DCS filed another CHINS petition after learning that Father had a third child, A.W., who was living with Father's mother. Father failed to appear at the initial hearing on the CHINS petition relating to A.W., and the juvenile court ordered removal of A.W. from Father's care and authorized placement in foster care with paternal grandmother. On August 10, 2016, the juvenile court entered its order adjudicating the Children CHINS based on Father's request for "assistance maintaining … sobriety" and the allegations in the CHINS petitions. *Id*. at 32.

[5]     At a dispositional hearing held on September 7, 2016, the juvenile court ordered Father to participate in services to address substance abuse and instability, including home-based therapy, home-based case management, to submit to a substance abuse assessment, and to submit to random drug screens. The court also ordered that A.W. be removed from her parental grandmother's home due to safety concerns and placed in foster care.[2] Following a May 10, 2017 permanency hearing at which Father did not appear, the juvenile court changed the permanency plan from reunification to adoption for the Children. DCS filed petitions for the involuntary termination of Father's parental rights on August 8, 2017. On May 17, 2018, the juvenile court held a termination of parental rights hearing. The court issued its order terminating Father's parental

---

[2] A.W. was placed in the same home as D.W. and B.W.

rights to the Children on May 25, 2018. The court made the following findings in support thereof:

10. Home based therapy was referred to address any underlying needs, and to help in alleviating substance abuse by learning coping skills.

11. Therapy would also have addressed how substance abuse relates in regards to the [C]hildren. [Father] did not strongly agree that substance abuse affected his parenting.

12. Although therapy was referred at least three times, no monthly progress reports were received from service providers.

13. Erica Terry worked with [Father] as his home based case manager between July of 2016 to March of 2017.

14. Ms. Terry helped [Father] with filling out employment applications and transportation. She also tried to help him address his heroin addiction.

15. [Father] worked "here and there" at temporary jobs for a total of one week while Ms. Terry was the case manager.

16. [Father] had unstable housing during this time, living with his mother, the [C]hildren's maternal grandmother, and in a hotel, none which were appropriate for the [C]hildren. At the time of trial, he was residing with his grandmother in a two-bedroom residence.

17. Case management was closed due to Ms. Terry not being able to locate [Father]. She reported no progress had been made

in addressing issues and felt that additional time would not help. [Father] did not do things on his own.

18. The major condition to be addressed is [Father]'s substance abuse which included heroin use before and during the CHINS cases.

19. [Father] went into a five-day detoxification program in July of 2016, but failed to follow up on recommendations. He relapsed and was readmitted to detoxification in August of 2016. He left after three days and failed to follow up.

20. [Father] may have done another detoxification in the fall of 2017.

21. [Father] did another detoxification program from April 18, 2018 until April 30, 2018. He received a diagnosis at discharge of Mood Disorder, Psychosis, and Opioid and Alcohol Dependence.

22. [Father] was to follow up with a mental health intake on May 1, 2018. He failed to do so. Psychiatric medical management and outpatient drug treatment were pending the May 1, 2018 intake which was not followed up on.

23. Random urine screens were referred in June of 2016. As of April of 2017, [Father] had submitted to one screen.

24. Home Based Case Manager Terry would transport [Father] to submit to screens but he would mostly fail to get out of the car.

25. [Father] did screens inconsistently in the fall of 2017 and early 2018.

26. On screens taken between December 14, 2017 and February 27, 2018, [Father] tested positive for illegal drugs twelve times. The drugs differed at times but included methamphetamine, amphetamine, THC, and Buprenorphine.

27. [Father] has failed to undergo a drug screen since March 2, 2018.

28. [Father] testified he has overcome his addictions, and does not need drug services.

29. [Father] presented in court with a poor memory and somewhat scattered thoughts. This, coupled with [Father] relying on providers and family raise serious concerns about [Father]'s ability to parent three children.

30. The [C]hildren have been in therapy since September of 2017, and have progressed to the point that goals of processing trauma and coping skills have been met.

31. The [C]hildren are together in a preadoptive foster home where they have been observed as comfortable and have integrated into the preadoptive family.

32. The Court suspended [Father]'s parenting time on May 10, 2017, when the [C]hildren's plan for permanency was changed to adoption, at which time the Court found that neither parent had made any meaningful or sustainable progress toward reunification.

33. The Guardian ad Litem and [C]hildren's therapist never recommended that parenting time be reinstated. The therapist was concerned that parenting time would be traumatic for the [C]hildren and they could regress.

34. There is a reasonable probability that the conditions that resulted in the [C]hildren's removal and continued placement outside the home will not be remedied by [F]ather who has not followed up with drug treatment recommendations after attending detoxification at least three times. He has not successfully participated in services to overcome housing and employment instability. The [C]hildren's CHINS cases have been open two years and [Father] has not made sustainable progress during that time.

35. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the [C]hildren's well-being in that it would pose as a barrier to obtaining permanency for them through an adoption when their [F]ather is unable to offer permanency and parent in a safe and stable environment, or meet the [C]hildren's needs.

36. Based on the length of time the CHINS cases have been pending, the services offered but not completed, and the question of whether it would be safe to return the [C]hildren, the Guardian ad Litem, Jessica Sherman, recommends termination of parental rights so the [C]hildren can move on with their lives. Ms. Sherman believes that giving [Father] additional time would interfere with permanency and create more stress and anxiety for the [C]hildren.

37. The [DCS] family case manager does not feel that issues have been remedied, or will be. She also feels that the [C]hildren have a great familial bond where they reside.

38. The [C]hildren's therapist believes it would be detrimental if the [C]hildren were removed from their placement. The [C]hildren need stability and consistency.

*Appellant's Appendix Vol. II* at 41-2.  Father now appeals.  Additional facts will be provided as necessary.

## Discussion & Decision

Before we consider Father's arguments that the evidence was insufficient to support termination of Father's parental rights, we first address his claim that the juvenile court could not rely on the results of his drug tests because DCS could not establish a reliable chain of custody.  Specifically, Father argues that the chain of custody for his drug tests is unreliable because (1) the collection technician left specimens unattended in his car, (2) the specimens were left in a FedEx drop box with no testimony regarding FedEx procedures, and (3) the laboratory toxicologist did not know who unsealed Father's samples prior to testing.

We begin by noting that DCS is not required to establish a perfect chain of custody.  *See Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002).  "To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition."  *Id*. (citing *Cliver v. State*, 666 N.E.2d 59, 63 (Ind. 1996)).  "[O]nce the State 'strongly suggests' the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility."  *Id*. (quoting *Wrinkles v. State*, 690 N.E.2d 1156, 1160 (Ind. 1997)).  Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties.  *Id*.  To mount a successful challenge to the chain of

custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Id*.

[8] The collection technician who collected specimens from Father testified that he would leave specimens in his car while collecting specimens from other individuals, but that he was the only person who had access to his car, which was locked at all times. The technician further described the process in which he collected the samples and his handling of the samples thereafter. The technician would apply gloves, open a sealed test kit, and label the collection tubes. The technician would then open the mouth swab and, without touching the swab itself, direct the donor to pull the swab out and apply it to their mouth until it turned blue indicating a sufficient sample of saliva had been collected. The technician would then put the swab in a collection tube and seal it. The sealed tube would then be put into a bag that was then sealed and placed into a FedEx bag that was sealed as well. To ship the samples to the laboratory, the technician would drop the sealed bags at a FedEx drop box. The technician testified that he followed this procedure for all drug tests and that he had collected approximately 1800 specimens during his employment with the drug testing company.

[9] Once the specimens arrived at the laboratory, an employee inspected the packaging and specimen to ensure that all seals remained intact. If there was evidence of tampering, such would have been noted on the laboratory report. Additionally, a forensic toxicologist and custodian of records with the laboratory testified that there were no notations indicating that Father's

specimens were compromised in any way and that the results were accurate. DCS's evidence provides reasonable assurances that Father's mouth swabs were undisturbed and that the results of the testing were accurate. *See Culver v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000) (finding that the State established a proper chain of custody when testimony revealed that blood samples were contained in a marked and sealed box that was intact when the forensic DNA examiner tested the evidence).

[10] Father presented no evidence other than to imply a mere possibility that the samples may have been altered. DCS's evidence established that Father's specimens were handled and stored in such a way that it would be nearly impossible for someone to conceal the fact that the specimens were mixed up or had been tampered with. Father's arguments go to the weight of the evidence, not its admissibility. The juvenile court properly admitted Father's drug test results into evidence.

[11] Having determined that the trial court could rely on the drug test results, we now turn to Father's arguments that the evidence was insufficient to support the involuntary termination of his parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind.

Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[12] The trial court entered findings in its order terminating Father's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[13] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[14] Father argues that the evidence was insufficient to support the trial court's termination of his parental rights. Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[15] Father challenges the court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented clear and

convincing evidence that there is a reasonable probability the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied and that continuation of the parent-child relationship poses a threat to the Children's well-being. *See* I.C. § 31-35-2-1(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in the Children's removal or continued placement outside Father's care will not be remedied.

[16] In making such a determination, the trial court must judge a parent's fitness to care for his child(ren) at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id*. In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no

reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[17] Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Although a trial court is required to give due regard to changed conditions, this does not preclude a finding that a parent's past behavior is the best predictor of his or her future behavior. *Id.*

[18] The Children were removed from Father's care because of Father's admitted drug use and request for help to obtain sobriety. DCS also identified Father's instability in housing and employment as reasons for removal of the Children. Throughout the CHINS proceedings, Father did not participate in a majority of the referred services for his substance abuse and demonstrated a pattern of relapsing after receiving treatment. As noted by the court in its order, Father attended a five-day detoxification program, but failed to follow up or comply with recommendations upon his release. A short time after his release, Father was readmitted into a detoxification program, but left after three days and again failed to comply with recommended services. Father points to his latest effort of participating in a detoxification program from April 18 until April 30, 2018, which is nearly two years since the Children were removed from his care and

about one month before the termination hearing, as evidence that there is a reasonable probability that the conditions resulting in removal of the Children will change. Father's history of drug use and multiple relapses, however, is more telling of the probability of whether circumstances will change, especially in light of Father's minimal participation in other services.

[19] Father also failed to submit to random drug screens. Even when his home-based case manager provided transportation so Father could submit to a drug screen, Father would refuse to get out of the car. Of the drug screens Father submitted, most of which were in late 2017 and early 2018, he tested positive for illegal drugs (i.e., methamphetamine, amphetamine, THC, and/or buprenorphine) twelve times. Father did not submit any drug screens after March 2, 2018.

[20] Father wholly failed to comply with home-based therapy and home-based case management. Although his case manager made three referrals, Father did not participate in any services. With regard to employment, Father's case manager helped Father apply for jobs, but over the course of nearly two years, Father worked for a total of one week. With regard to housing, Father lived with either his mother, Mother's mother, or in a motel. Father's case manager testified that none of these locations were suitable for the Children.

[21] Father made little to no progress in changing the conditions that resulted in removal of the Children from his care. Father's recent efforts at trying to maintain sobriety, obtain employment, and secure a place to live are

overshadowed by Father's lack of effort to address these issues in the nearly two years since the CHINS action was filed. As the court found, Father did not make any "sustainable progress." *Appellant's Appendix Vol. II* at 42. Father's arguments to the contrary are simply requests to reweigh the evidence, which we will not do on appeal. The evidence was sufficient to support the court's determination that there is a reasonable probability that the conditions that resulted in the removal of the Children will not be remedied.

[22] Father also argues that the evidence was insufficient to support the trial court's finding that termination was in the Children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

Father's case manager, the Children's therapist, and the Guardian ad Litem all testified that the Children need permanency. Service providers also expressed concern that the Children would regress if the proceedings were permitted to continue. Each service provider believed that termination was in the best interests of the Children. We will not second guess the providers in this regard.

In sum, the court could properly rely on the results of Father's drug screens, and the evidence was sufficient to support the court's termination of Father's parental rights to the Children.

Judgment affirmed.

Najam, J. and Pyle, J., concur.