## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 19 2019, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

Don R. Hostetler
Indianapolis, Indiana

ATTORNEY FOR APPELLANT FATHER

Talisha Griffin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: A.G., Minor Child,

A.S., Mother, and T.G., Father,

*Appellants-Respondents*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*, and

Child Advocates, Inc.,

*Guardian ad Litem.*

December 19, 2019

Court of Appeals Case No. 19A-JC-1026

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Jennifer Hubartt, Magistrate

Trial Court Cause No. 49D09-1812-JC-3086

**Brown, Judge.**

[1] A.S. ("Mother") and T.G. ("Father," and together with Mother, "Parents") appeal the trial court's order determining that A.G. is a child in need of services ("CHINS"). We affirm.

### *Facts and Procedural History*

[2] In August 2018, Indiana Department of Child Services ("DCS") received a report concerning allegations of substance use and assigned family case manager Regan Woodruff ("FCM Woodruff") to A.G., who had just been born. Conducting an assessment, FCM Woodruff spoke with Mother, who "disclosed that she was not currently using any illegal drugs at the time [and] that she had previously used marijuana and cocaine recreationally and had been addicted to pills, specifically opiates." Transcript at 8. Per an informal adjustment, Mother agreed to random drug screens, home-based case management, and a substance use assessment.

[3] On December 20, 2018, DCS filed a verified petition alleging that A.G. was a CHINS, that she was born drug-exposed to cocaine and that Parents failed to provide her with a safe, stable, and appropriate living environment free from substance abuse. It also alleged that Mother tested positive for cocaine and marijuana on numerous occasions during the period of the informal adjustment since October 2018 and that Father knew of Mother's drug use and did not take necessary action to protect A.G.

[4]     At an initial hearing held on the same day, at which Mother and Father did not appear, the court ordered A.G. removed. When family case manager Shelicia Jones ("FCM Jones") later visited Mother's home to remove A.G., neither Mother nor the child was present. FCM Jones contacted her, and Mother indicated that she was not willing to turn A.G. over and would take the child to Atlanta before she allowed DCS to obtain custody. When contacted, Father stated he lived in Atlanta and that "before DCS would take custody of his child, he would move [Mother] and [A.G.] to Atlanta and DCS would not see the child until she was 18."[1] *Id.* at 21. DCS filed a missing persons report for A.G. due to Parent's unwillingness to provide an address, and when it ultimately obtained custody on December 28, 2018, A.G. was placed in foster care.

[5]     On January 4, 2019, the court issued an order indicating that it held a continued hearing at which Parents appeared, it appointed counsel for Father, and Mother indicated that she planned to engage private counsel. The order indicates the court appointed a guardian ad litem, retained A.G. in foster care, and ordered that Parents have supervised parenting time. On January 18, 2019, the court held a pretrial hearing at which Parents appeared, each with counsel, Father requested "mediation and fact finding dates" and indicated that he would not be willing to "waive the 60," and the court set the fact-finding hearing for February

---

[1] When asked during cross-examination at the fact-finding hearing about serving process on Father for the December 20, 2018 initial hearing, FCM Jones indicated that Father "wasn't in Atlanta" and that he disclosed to her "he was never in Atlanta." Transcript at 37.

15th, pursuant to counsels' schedules.[2] Supplemental Transcript at 4. After indicating that it had "drug screen results and some positive screens for substances," DCS's counsel stated "Judge[,] we don't have thirty days to file a motion requesting authorization for the toxicologist to appear telephonically so I'll just do that orally today," both parents objected, and the court took the request under advisement. *Id.* at 6-7. The court issued an order on the same day which stated DCS "orally requests authorization for telephonic testimony . . . from John Martin, Wayne Ross, Kimberly Peterson, Bridget Lorenz, Donna Coy." Father's Appendix Volume II at 94.

[6] On January 25, 2019, the court issued an order on submission of report stating it had set the hearing date of February 15, 2019, that "[a]t that time," DCS moved the court to permit the telephonic testimony of "Bridget Limberg, Kimberly Peterson, and John Martin, noting that they were not 30 days between the setting of the trial date and the trial," and that Parents, "by counsel, were provided with approximately 27 days of notice of the DCS Motion." *Id.* at 100-101. It indicated that, "[a]fter consideration of the Motion, and of any written objection, and, after consideration [sic] Ind. Admin. R. 14, the court finds these relevant factors," and further stated: "John Martin and Kimberly Peterson live in California. Ms. Lemberg lives in Michigan respectively, and requiring each to travel for testimony would cause great burden and inconvenience," that the

---

[2] The court's order from the same day indicated the parties agreed to mediation and to set a fact-finding hearing, but were "unwilling to waive the sixty (60) day trial rule." Father's Appendix Volume II at 93.

telephonic testimony of Martin, Peterson and "Bridget Limberg" will not preclude effective cross-examination by Parents, and that Parents were not prejudiced by the telephonic testimony. *Id.* at 101.

[7] On February 15, 2019, Parents appeared at the fact-finding hearing. FCM Woodruff testified that Mother disclosed she had been addicted to pills, specifically opiates. She testified about Mother's assessment in August 2018 and stated that she had indicated she was "using illegal substances up until the point where she found out she was pregnant and had already been pregnant prior to stopping her substance use." Transcript at 10. When asked whether she conversed with Mother about Father "at this time," FCM Woodruff answered affirmatively and stated that she had indicated that she was no longer with Father "because he was still using substances and did not want to stop." *Id.*

[8] FCM Jones testified about attempting to remove A.G. in December 2018 and her communication with Parents and stated that, during the removal incident, A.G.'s whereabouts were unknown to DCS for eight days before it finally took custody of her. *Id.* at 21. She indicated that she referred Mother to random drug screens, substance abuse assessments, home-based case management, individual therapy, and intensive outpatient treatment. When asked whether she had conversations with Mother about drug use "[w]hile the case was open as an Informal Adjustment," she answered affirmatively and, in explaining the conversations, stated that, in October 2018, a child and family team meeting occurred for the purpose of discussing a positive cocaine drug screen. *Id.* at 17. Mother objected, the court allowed FCM Jones to testify about the discussion,

and she indicated that Mother had stated she used cocaine and marijuana recreationally and that she had administered to Mother an oral drug screen.[3] When asked whether, in the "conversation that you were having with Mother," she "was talking about current drug use or things that had happened in the past," FCM Jones stated, "[c]urrent drug use." *Id.* at 19. She testified that she had safety concerns for A.G. in Mother's care "because of the current drug use" and "there was safety concerns regarding [Mother] transporting the child under the influence." *Id.* She explained that "[a]t this time Mother was employed on the West side and had stated to [her] that she was transporting the child on the West side for daycare." *Id.* She also explained that Mother had stated she was transporting A.G. to doctor's appointments without a license.[4] When asked what actions DCS took when these safety concerns arose, she indicated that the informal adjustment was unsuccessfully closed and the CHINS petition was filed. She indicated that she had not been able to verify Mother's employment and, with regard to housing, that Mother had provided an "address that she resides with" Father. *Id.* at 22.

[9]     FCM Jones answered affirmatively when asked whether she had any additional conversations with Mother about drug use since the CHINS case was filed,

---

[3] In sustaining an objection about FCM Jones discussing the results of the test, the court precluded her testimony from mentioning the "results of tests that are not in evidence." Transcript at 18.

[4] She later explained further that there was concern with supervision "with [Mother] admitting to transporting the child with no license to doctor's appointments as well as to daycare, placing the child in danger." Transcript at 32. During cross-examination, FCM Jones stated that Mother had told her that she had never had a driver's license.

indicated that Mother requested her drug screen results be emailed to her, and stated that she sent a message informing Mother "which screens have been positive for Cocaine." *Id.* After the court sustained Mother's objection "to the extent it involve[d] screen results," she testified that Mother shared that "she had a prescription for an opiate that was prescribed to her during her pregnancy that she did not test positive for throughout the life of the IA but has subsequently throughout the CHINS proceeding" and that Mother sent a picture of the prescription. *Id.* at 23. DCS's counsel asked if Mother "made any other disclosures about new usage," and she answered that "[t]hrough Mother's concern for [A.G.'s placement]," she "has stated that the usage is due to stress, that she can't concentrate with knowing that her child – she can't concentrate on sobriety with knowing that her child still remains in foster care." *Id.*

[10] Regarding Father, FCM Jones testified that he had been offered the opportunity to participate in other services, that his response was "he does not need services provided by DCS," and that DCS wanted Father to participate in random drug screens and a substance abuse assessment. *Id.* at 24. She also indicated she had not been able to verify that Father had stable employment. She indicated that she underwent training to be able to administer drug screens and described: her duties in administering them; the procedures used to collect drug screen samples, seal them for sending, ensure they are not contaminated, and send them by UPS; and the manner in which she collected a sample from Father and followed the collection procedure she had just described. Over objection, the court admitted as Petitioner's Exhibit 1 the consent form that Father and FCM

Jones signed to administer the screen, which includes their signatures and the date as "1/11/2019" and states "Specimen ID: S2955283." Exhibits Volume at 4. Below the box containing FCM Jones's signature as the "Collector/Observer Certification," Petitioner's Exhibit 1 states "Megumi R." *Id.* FCM Jones indicated that Father's sample was under her sight and control during the collection and sealing process, that she placed the sample in a UPS envelope, and that at the time she left the sample for mailing, she did not believe the sample had been compromised.

[11] After FCM Jones testified, DCS called, and the court contacted telephonically, toxicologist Bridget Lemberg. Mother's counsel objected under Administrative Rule 14 to "the inability to . . . confront the witness face to face," which the court overruled.[5] Transcript at 50. Lemberg testified that she was the lab director and toxicologist for Forensic Fluids Laboratories in Kalamazoo, Michigan; that, as the lab director, she ensured "all employees follow our standard operating procedures which consists of an internal chain of custody, quality control that we run daily"; and that she was also responsible for "going through each one of the positive[s] by itself" and "[g]oing back and looking up the screening test results to make sure that . . . we followed our standard operating procedures." *Id.* at 53. She described the screening process used by Forensic Fluids to analyze samples received from DCS and the additional confirmation testing that a positive screen

---

[5] In later overruling an objection that Lemberg testified about chain of custody while she looked at a packet of documents, the court stated it had already dealt with the telephonic testimony issue and that "[a]s to your questions about the chain of custody that will go to waive [sic] and not admissibility." Transcript at 61.

undergoes. DCS's counsel showed Lemberg what it had marked as Petitioner's Exhibit 3 and she identified it as the two-page affidavit "that we send when we send test results . . . for Court," stated it "says that the test results that accompany this affidavit are true and accurate," and affirmed that her signature was at the bottom.[6] *Id.* at 57. DCS moved to admit the document, Father's counsel objected and stated that there were no pages attached and "this form has been altered," and DCS's counsel stated that "the document that was attached is going to be [Petitioner's E]xhibit 4" and that she could wait and introduce everything at one time, and the court took the motion under advisement. *Id.* at 58.

[12] Lemberg indicated that the person who received the UPS bag with Father's January 11, 2019 sample was Megumi Roberts, that the UPS bags are checked by a specimen processor who follows certain procedures, and that there was no indication that the sample had been tampered with or any concerns about its integrity. She testified that this "specimen sample ID, S as in Sam, 2955283, initially screened" for marijuana, cocaine and oxycodone, indicated that the sample received further testing in the confirmation lab, which confirmed the results, stated the results, and affirmed that the results were documented in what had been marked as Petitioner's Exhibit 4, that her name was on the report as the lab director or toxicologist, and that she had determined that the

---

[6] Petitioner's Exhibit 3 states "As a result of the procedures employed by Forensic Fluids Laboratory Inc., I can state that both the Chain of Custody and that the test results are scientifically reliable" and that the "attached document(s) are the original or exact duplicates of the original business records" maintained in regards to Father and includes the signature of Bridget Lorenz Lemberg. Exhibits Volume at 9-10.

results were trustworthy. *Id.* at 66. The court admitted Petitioner Exhibits 3 and 4 over Parent's objections. Petitioner's Exhibit 4 indicates that Father tested positive for THC, cocaine, and oxycodone on January 11, 2019.

[13] On March 14, 2019, the court entered an order which found A.G. a CHINS and stated:

> Findings of Fact:
>
> * * * * *
>
> 7. In August, 2018, mother admitted to FCM Woodruff that she used marijuana, cocaine, and pain pills during her pregnancy with the child. Mother admitted that she had a previous addiction to opiate pain pills and recreationally used marijuana and cocaine.
>
> 8. In August, 2018, mother identified [Father] as the father, but told FCM Woodruff she was no longer involved with [Father] due to his ongoing drug use.
>
> * * * * *
>
> 30. Toxicologist Bridget Lemberg reviewed [F]ather[']s 1/11/19 drug screen. Father[']s use of marijuana, cocaine, and oxycodone occurred approximately 24 hours prior to the drug screen[']s administration.
>
> 31. Following the CHINS filing and the removal of the child, [F]ather stated to FCM Jones that he is unwilling to participate in any services offered by DCS.
>
> 32. Based upon [F]ather[']s statement that he would not participate in any services offered by DCS, FCM Jones has not offered [F]ather additional drug screens.

33.  Parents currently reside together.  Each parent is aware of the other[']s past and current drug use.

34.  Mother has been offered services to address her drug use and admitted addiction since August of 2018.  Mother failed to benefit from the services when provided on a voluntary basis under the IA case and is still admittedly using illegal drugs.

35.  Father has been deceptive regarding his residence, has disregarded the Court[']s order for removal of the child, and has been adamant that he will not participate in services with DCS.

36.  Father has not provided a drug screen since 1/11/19, when he was positive for marijuana, cocaine, and oxycodone.  His failure to provide a screen and/or lack of drug screens since 1/11/19 is not evidence of [F]ather[']s sobriety.

37.  The child is an infant and is completely dependent upon her caregiver(s) to meet all of her needs.

Father's Appendix Volume II at 129-131.  On April 5, 2019, the court entered a dispositional decree.

## *Discussion*

[14]    Father first argues that the court abused its discretion in allowing Lemberg's telephonic testimony and contends that DCS did not comply with the requirements of Ind. Admin. Rule 14 (B).  In asserting that DCS did not meet the "only exception to the Rule's thirty-day notice and service requirement" by failing to move for telephonic testimony on or before January 16, 2019, Father directs us to Ind. Admin. Rule 14(B)(3)(e) and contends that the exception does not apply because the court is permitted "to alter the time deadlines only upon a motion made *prior* to the thirty-day deadline."  Father's Appellant Brief at 18.

He additionally argues that no evidence or argument by DCS supports the court's finding of good cause and asserts that the court did not consider all the factors under Ind. Admin. Rule 14 (B)(2).

To the extent that we must interpret our administrative rules, we do so *de novo*. *C.S. v. State*, 131 N.E.3d 592, 595 (Ind. 2019) (interpreting Ind. Admin. Rule 14 *de novo*). Ind. Admin. Rule 14(B) provides that a "trial court may use telephone or audiovisual communications subject to":

> (1) the written consent of all the parties, entered on the Chronological Case Summary; or
>
> (2) upon a trial court's finding of good cause, upon its own motion or upon the motion of a party. The following factors shall be considered in determining "good cause":
>
> > (a) Whether, after due diligence, the party has been unable to procure the physical presence of the witness;
> >
> > (b) Whether effective cross-examination of the witness is possible, considering the availability of documents and exhibits to counsel and the witness;
> >
> > (c) The complexity of the proceedings and the importance of the offered testimony in relation to the convenience to the party and the proposed witness;
> >
> > (d) The importance of presenting the testimony of the witness in open court, where the fact finder may observe the demeanor of the witness and impress upon the witness the duty to testify truthfully;
> >
> > (e) Whether undue surprise or unfair prejudice would result; and

> (f) Any other factors a trial court may determine to be relevant in an individual case.
>
> (3) A party or a trial court if it is acting on its own motion must give notice of the motion to use telephone or audiovisual telecommunication as follows:
>
>> (a) Any motion for testimony to be presented by telephone or audiovisual telecommunication shall be served not less than thirty (30) days before the time specified for hearing of such testimony;
>>
>> (b) Opposition to a motion for testimony to be presented by telephone or audiovisual telecommunication shall be made by written objection within seven (7) days after service;
>>
>> (c) A trial court may hold an expedited hearing no later than ten (10) days before the scheduled hearing of such testimony to determine if good cause has been shown to present testimony by telephone or audiovisual telecommunication;
>>
>> (d) A trial court shall make written findings of fact and conclusions of law within its order on the motion for testimony to be presented by telephone or audiovisual telecommunication; and
>>
>> (e) For cause found, a trial court may alter the time deadlines set forth in paragraphs (a) through (c) upon motion made prior to the expiration of the time for the required action.

[16]    Our review of the record reveals that, at the January 18, 2019 pretrial hearing, the court set the fact-finding hearing for February 15th upon Father's request and unwillingness to waive the sixty-day trial rule requirement, and pursuant to counsels' schedules. Supplemental Transcript at 4. In light of the newly-set date, DCS's counsel alerted the court that it had drug screen results and of the

thirty-day requirement needed to file a motion requesting authorization for the toxicologist to appear telephonically before making the motion verbally. The court's January 25, 2019 order indicated that Parents, present at the meeting and represented by counsel, were provided with approximately twenty-seven days of notice. The order continued: "[a]fter consideration of the Motion, and of any written objection, and, after consideration [sic] Ind. Admin. R. 14, the court finds these relevant factors"; "John Martin and Kimberly Peterson live in California. Ms. Lemberg lives in Michigan respectively, and requiring each to travel for testimony would cause great burden and inconvenience"; the telephonic testimony will not preclude effective cross-examination by Parents; and Parents were not prejudiced by the telephonic testimony. *Id.* at 101.

[17]  Regarding the finding of good cause, we additionally note that in this CHINS action two witnesses provided testimony about Father's positive drug screen result. The court admitted a total of four exhibits: a signed consent form for the drug screen, the CV of the testifying lab director for Forensic Fluids who lived out-of-state, the affidavit from the same witness certifying the reliability of the procedures and accuracy of the test results relating to Father, and the test results. Under the circumstances, we cannot say that the court incorrectly determined or failed to consider the Ind. Admin. Rule 14 (B)(2) factors in determining "good cause."

[18]  Father next argues that the court erred when it admitted Petitioner's Exhibits 3 and 4 and Lemberg's testimony regarding the exhibits "because the State failed to meet its burden in proving proper chain of custody," that Lemberg's

testimony was based on hearsay and not any personal knowledge sufficient to establish a proper chain of custody, and that, "[w]ithout the testimony or an affidavit from the individual or individuals who were responsible for the custody of the sample at all critical times, the court could not be confident in the integrity of the sample or the test results." Father's Appellant Brief at 21, 23-24. He contends that an oral swab sample is fungible evidence with a high potential for a mistake or mishandling, that the specimen processor, or the individual who collected the sample from its delivery at the laboratory and deposited it to the specimen processing room, was a significant witness for providing a chain of custody for the sample and did not testify, and that the professional who conducted the lab testing on the sample did not testify and was not identified by name or title.

[19] The admission of evidence is entrusted to the sound discretion of the juvenile court. *Matter of A.F.*, 69 N.E.3d 932, 941-942 (Ind. Ct. App. 2017) (citing *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 942. If a juvenile court abuses its discretion by admitting challenged evidence, we will reverse for that error only if it is inconsistent with substantial justice or if a substantial right of the party is affected. *Id.* (citing *In re S.W.*, 920 N.E.2d 783, 788 (Ind. Ct. App. 2010)).

[20] In describing the burden of establishing the chain of custody, Father points to caselaw occurring in the criminal context that predates the Indiana Supreme

Court's decision of *Troxell v. State*, in which the Court found no error in the admission of evidence challenged by a criminal defendant claiming error in the chain of custody of a DNA sample and provided:

> To establish a proper chain of custody, the State must give reasonable assurances that the evidence remained in an undisturbed condition. *Cliver v. State*, 666 N.E.2d 59, 63 (Ind. 1996). However, the State need not establish a perfect chain of custody, and once the State "strongly suggests" the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. *Wrinkles v. State*, 690 N.E.2d 1156, 1160 (Ind. 1997); *Jenkins v. State*, 627 N.E.2d 789, 793 (Ind. 1993) (noting that failure of FBI technician to testify did not create error). Moreover, there is a presumption of regularity in the handling of evidence by officers, and there is a presumption that officers exercise due care in handling their duties. *Wrinkles*, 690 N.E.2d at 1160; *Culver* [*v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000)]. To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Cliver*, 666 N.E.2d at 63.

778 N.E.2d 811, 814 (Ind. 2002). The *Troxell* Court also found that the absence of such information "goes to the weight of the evidence and not its admissibility." *Id.* at 815 (citing *Jenkins*, 627 N.E.2d at 793).

[21]  Here, the record reveals that FCM Jones testified about the procedures for collecting drug screen samples, ensuring that no contamination occurs, and sending samples, and that she collected a sample from Father following the procedure she described. She indicated that Father's sample was under her sight and control during the collection and sealing process, that she placed the

sample in a UPS envelope, and that at the time she left the sample for mailing, she did not believe the sample had been compromised. Lab director and toxicologist Lemberg testified that she ensured all employees follow an "internal chain of custody, quality control that we run daily" and described the process of receiving samples and analyzing them. Transcript at 53. We further observe Megumi Roberts received Father's sample, that both the consent form Father signed in Petitioner's Exhibit 1 and the test results in Petitioner's Exhibit 4 are for Specimen ID "S2955283," and that Lemberg indicated the sample, which had been initially screened for marijuana, cocaine and oxycodone, received further testing in the confirmation lab and that she determined the results were trustworthy. Under these circumstances, we cannot say that the court abused its discretion when it admitted the challenged drug test results.

[22] Parents next argue that the evidence is insufficient to support the court's determination that A.G. was a CHINS. Father argues that the evidence did not support Findings 8 and 33. He argues DCS did not present evidence that: he was currently using drugs at the time of the August assessment or fact-finding hearing, he was impaired at any time when caring for A.G., or he contributed to A.G. being born with substances in her blood cord or that it endangered her. He contends: the drug test results, even if properly admitted, "at most" indicate he "used drugs on one occasion when he was nowhere near his daughter," the evidence does not establish when he purportedly used drugs in the past, and that DCS did not observe him supervising A.G. Father's Appellant Brief at 29. Mother contests the finding that she used illegal drugs during the informal

adjustment period and argues: "at best," DCS has one admission from Mother that she took illegal drugs before she learned she was pregnant, no drug testing evidence contradicts her statement that she stopped using illegal drugs when she was pregnant; the only evidence DCS presented of drug usage after A.G.'s birth was the "FCM's ambiguous testimony of 'current' drug use"; and that "[w]ords (or the lack thereof) must mean something" such that the FCM's testimony "about 'usage' does not support the . . . finding that Mother admitted to taking illegal drugs" after the CHINS petition was filed. Mother's Appellant Brief at 12-13. She also contends that DCS failed to show that driving A.G. without a valid driver's license seriously endangered her or that she did not meet A.G.'s needs.

[23] DCS maintains that the findings which Father disputes are supported by the testimony and the reasonable inferences arising therein and contends that reversal is not warranted even if Finding No. 33 was erroneous because "[b]oth parents were abusing illicit substances, meaning neither parent was an appropriate care-giver." Appellee Brief at 27. It argues that the evidence shows that drug use was a current and ongoing problem for Parents, that illicit drug use endangers children and, in the case of A.G., leaves her without a competent caregiver, and that Parents will not provide A.G. with a safe and stable home free from substance abuse without the coercive intervention of the court.

[24] In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied*. Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences

drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* "We will reverse a CHINS determination only if it was clearly erroneous." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 578 (Ind. 2017). A decision is clearly erroneous if the record facts do not support the findings or if it applies the wrong legal standard to properly found facts. *Id.*

[25] "A CHINS proceeding is a civil action; thus, 'the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code.'" *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)). At the relevant time period Ind. Code § 31-34-1-1 provided:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
> >
> > (2) the child needs care, treatment, or rehabilitation that:
> >
> > > (A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

(Subsequently amended by Pub. L. No. 198-2019, § 8 (eff. July 1, 2019)).

[26] The CHINS statute does not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage. *In re N.E.*, 919 N.E.2d at 106. The conduct of one parent can be enough for a child to be adjudicated a CHINS. *Id.* The purpose of a CHINS adjudication is to protect children, not punish parents. *Id.* The resolution of a juvenile proceeding focuses on the best interests of the child, rather than guilt or innocence as in a criminal proceeding. *Id.*

[27] To the extent Mother and Father cite *Perrine v. Marion Cty. Office of Child Services*, in which this Court held that a single admitted use of methamphetamine, outside the presence of a child and without more, was insufficient to support a CHINS determination, we find this case to be distinguishable. 866 N.E.2d 269, 277 (Ind. Ct. App. 2007). In *Perrine*, at a hearing on the CHINS petition the mother answered affirmatively when asked "[i]s that the only time you ever used methamphetamine," indicated that she was at a friend's house when she used it, and testified that she "never used drugs around [the child]. Never ever. Even prescription medicine . . . ." *Id.* at 275-276.

[28] Having found that Petitioner's Exhibit 4 was properly admitted, we observe that Father tested positive for THC, cocaine, and oxycodone on January 11, 2019. Father indicated to DCS that he did not need to participate in services. Regarding Mother, the record reveals that she indicated to FCM Jones that she resided with Father. FCM Jones testified that Mother indicated in October 2018 that she used cocaine and marijuana recreationally, that Mother spoke of current drug use, and that she had safety concerns for A.G. as a result. FCM Jones testified about her conversations with Mother about drug use after the CHINS case was filed, that Mother shared she had a prescription for an opiate for which she tested positive subsequently, and that Mother, through concern for A.G.'s placement, had made a disclosure about usage due to stress.

[29] To the extent Parents' arguments invite us to reweigh the evidence and reassess witness credibility, we are unable to do so. *See In re S.D.*, 2 N.E.3d at 1286. The evidence most favorable to the judgment supports the court's findings that Parents' actions or inactions have seriously endangered A.G., that A.G.'s needs are unmet, and that those needs are unlikely to be met without State coercion. *See id.* at 1287. In light of the unchallenged findings and the evidence and testimony presented at the fact-finding hearing, we cannot say that the trial court's judgment is clearly erroneous.

[30] Affirmed.

Baker, J., and Riley, J., concur.